## BRACKIN v. UNITED STATES.
### No. 17766.
#### Court of Claims.
#### April 6, 1942.

---

[1] United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914.

J. Hubert Farmer, of Dothan, Ala., for plaintiff.

J. H. Sheppard, of Washington, D. C., and Samuel O. Clark, Jr., Asst. Atty. Gen. (Robert N. Anderson and Fred K. Dyar, both of Washington, D. C., on the brief), for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

JONES, Judge.

This action is based upon a resolution of the United States Senate (S. Res. 136, 77th Congress, 1st session) authorizing this court to inquire into the claim of the plaintiff and make a report to the Senate of the facts and circumstances relating thereto. Accompanying the resolution was Senate Bill 1628, 77th Congress, 1st session, for the relief of S. R. Brackin. At the same time there was submitted another resolution (S. Res. 286, 76th Congress, 3rd session) transmitting a bill of a general nature (S. 963, 76th Congress, 3rd session) which covered the same subject matter.

The jurisdiction and procedure are under Section 151 of the Judicial Code, 28 U.S. C.A. § 257. Plaintiff filed his petition within the time required by the Code.

The plaintiff seeks to recover the amount paid for tax-exemption certificates issued under the Bankhead Cotton Act, 48 Stat. 598.

For the period involved the act imposed a tax at the rate of 5.45 cents per pound[1] upon the ginning of cotton from the 1935-1936 crop produced and marketed in excess of the amounts allotted by the Secretary of Agriculture. The amount of cotton exempt from tax was fixed under the terms of the act at 10,500,000 bales for the year involved.

The requirements of the law could be satisfied either by the payment of the amount of the tax or by the surrender of tax-exemption certificates which were transferable. Upon receipt of payment in cash or upon the furnishing of a tax-exemption certificate bale tags were issued. Cotton could not be moved into commerce without a bale tag affixed thereto.

If a farmer produced more than his allotted share of what it was estimated the market would absorb in any one year, this extra production was classed as surplus cotton. The farmer who produced it had a choice of three courses: (1) He could sell it in the open market, in which event he paid the tax; (2) he could purchase the tax-exemption certificates from a farmer who had not produced the amount of his quota, or from a pool of such certificates, and in this manner have his surplus portion of the commodity move immediately into commerce; or (3) he could take the surplus production home and store it on his farm or in a public warehouse without paying the tax and could include it within his quota for the following year and thus market it without tax payment.

If a farmer produced less than his market allotment he could dispose of his excess certificates in one of two ways: (1) He could surrender the excess certificates to a pool established by the Secretary of Agriculture, in which event he would participate proportionately in the net proceeds of the sale of certificates made by the pool manager to farmers who had produced more than their allotment; or (2) with the approval of the county agent he might sell them to another farmer, if one could be found in his locality who had produced more than his allotment, in which event he received the full proceeds of the sale without any deduction for expenses. Thus whether the individual farmer voluntarily joined the pool or chose to sell his excess certificates to another farmer, in neither event did the Government have any interest in the proceeds.

The plaintiff produced cotton in excess of his allotment and on November 14, 1935, he purchased from the 1935 pool tax-exemption certificates at the rate of 4 cents per pound to cover the amount of his excess production, paying therefor by check made payable to E. L. Deal, Certificate Pool Manager. It was endorsed by him for deposit in the Treasury to the account of G. F. Allen, Chief Disbursing Officer of the Division of Disbursement, and the funds were deposited in a special trust account.

The Bankhead Cotton Act was repealed February 10, 1936, 49 Stat. 1106.

The Supreme Court has not passed directly upon the constitutionality of the Bankhead Cotton Act. True, in the case of United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914, the Supreme Court held that the processing tax provisions in the Agricultural Adjustment Act of 1933 were invalid. In that act, 48 Stat. 31, 7 U.S.C.A. § 601 et seq., however, the taxes were levied on the processing of the entire commodity, with a drawback on that portion which flowed into foreign markets. The resulting funds were used to make benefit payments to farmers who limited or curtailed production. Emphasis was placed on reduced

1 50 per centum of the average price at central markets, but not less than 5 cents per pound.

production. The first powers conferred on the Secretary of Agriculture in the 1933 act were "to provide for reduction in the acreage or reduction in the production for market, or both, of any basic agricultural commodity." § 8(1). The court held that the processing fees were intimately linked to control of production which the court held to be a local matter and without the scope of Congressional powers.

The Bankhead Cotton Act provided for tax on the ginning of the excess or surplus production only. It was to be collected only if the surplus was to be marketed or moved into commerce. Its first stated purpose was "to promote the orderly marketing of cotton in interstate . and foreign commerce." It placed emphasis on commerce. The second Agricultural Adjustment Act, known as the Agricultural Adjustment Administration Act of 1938, 52 Stat. 31, 7 U.S.C.A. § 1281 et seq., followed largely the same pattern as the Bankhead Act. It provides penalties on the marketing of surplus production. It also emphasizes commerce.

■ In United States v. Darby, 312 U.S. 100, 113, 61 S.Ct. 451, 456, 85 L.Ed. 609, 132 A.L.R. 1430, it was held that the power of regulating interstate commerce extends even to the point of prohibiting it. We quote: "While manufacture is not of itself interstate commerce the shipment of manufactured goods interstate is such commerce and the prohibition of such shipment by Congress is indubitably a regulation of the commerce. The power to regulate commerce is the power 'to prescribe the rule by which commerce is to be governed.' Gibbons v. Ogden, 9 Wheat. 1,196, 6 L.Ed. 23. It extends not only to those regulations which aid, foster and protect the commerce, but embraces those which prohibit it."

In the case of Mulford v. Smith, 307 U.S. 38, 59 S.Ct. 648, 83 L.Ed. 1092, the Supreme Court upheld the provisions of the Agricultural Adjustment Administration Act of 1938, which levied a penalty of 50% on the marketing of tobacco produced in excess of the quotas allotted to producers, on the ground that Congress had provided for the levy in the exercise of its power to regulate interstate commerce. The penalties levied under the provisions respecting tobacco in the Agricultural Adjustment Administration Act of 1938 were similar to the so-called taxing provisions of the Bankhead Cotton Act. The levies

in each act were authorized under the same powers and were enacted for the same purpose. In order for plaintiff to be entitled to recover from the general fund of the Treasury, as for taxes illegally assessed and collected, it would be necessary to hold the taxing provision of the Bankhead Cotton Act invalid. We are not inclined to so hold. In the light of the decision in the Mulford and Darby cases, supra, we do not think the plaintiff was justified in assuming that the Bankhead Act was unconstitutional.

■ However, it is not necessary to rest the decision on this question. Whether the act was valid or invalid, we do not think the United States Government is legally obligated to pay to the plaintiff such sums out of the general fund of the Treasury. The plaintiff paid no tax. He simply purchased tax-exemption certificates.

The million five hundred thousand tax-exemption certificates were issued by the Secretary of Agriculture to cover an equal number of bales of cotton. The Commissioner of Internal Revenue collected all taxes. If anyone held an exemption certificate for a bale of cotton no tax was paid to or collected by the Commissioner on such bale. The exemption certificates were allotted to individual farmers and became the property of such farmers. They were negotiable.

The plaintiff chose to purchase these exemption certificates at .4 cents per pound rather than pay the tax of 5.45 cents per pound.

Under the terms of the act 10,500,000 bales of cotton were not taxed, and if only that number of bales had been produced and marketed in 1935 no tax would have been collected. Both the selling and the pooling of the certificates were a redistribution or a reallotment of tax-free cotton.

The records of the Department show that during the time the act was in effect $22,423,479.94 was paid for tax-exemption certificates purchased from the pool. The manager of the pool estimated that an additional $30,314,399.76 was paid locally by farmers dealing with each other, and which did not go into the funds of the pool, but was paid directly by farmers who produced more than their allotment to farmers who produced less than their allotment. $1,562,097.62 was paid in money as taxes.

If payment is to be made out of a treasury that did not benefit to purchasers from

the pool there is practically the same reason for payment to farmers who dealt directly with each other. If there was compulsion in the one case there was compulsion in the other.

The sums collected on the cotton that was produced and marketed in excess of 10,500,000 bales were taxes, intended and collected as such, and as such went into the general fund of the Treasury. All these collections were returned to the taxpayers by direct appropriation. The proceeds of the sale of the tax-exemption certificates were an entirely different fund.

The regulations[2] under which the tax-exemption certificate pool was established show that the pool was established—September 5, 1934, after the cotton picking season began—for the benefit of the producers and to prevent some of them from becoming the victims of speculators. They show conclusively that the money was not collected as taxes, but simply placed in a fund and each holder of a certificate given in exchange for surrendering his certificate to the pool an evidence that he had an undivided interest in the proceeds of the pool. The regulations stipulate that the money was to be used first for the payment of the expense of operating the pool and the balance was to be distributed share and share alike among the holders of the certificates in proportion to the number surrendered by them. The funds were established in a special account. In no other way could vouchers or warrants be issued without additional appropriative action on the part of the Congress. In fact, the regulations show the establishment of such special account.

The Government collected no tax in connection with the tax-exemption certificates. Not one penny of the amount paid into the pool went into the general fund of the Treasury of the United States. Taxes are collected by the Commissioner of Internal Revenue or under his direction. The pool funds were controlled by the Secretary of Agriculture.

The United States had no pecuniary interest in the fund as such. Its officers were merely trustees of a fund belonging to others.

It will be noted that the bill which was transmitted in connection with the resolution provides for appropriation out of the general fund of the Treasury as for a Government obligation. The petition filed by plaintiff pursues this same objective. There is no such legal obligation on the part of the United States Government.

Whether the plaintiff has any legal interest in the pool trust fund, or in the balance thereof if any part of it remains undistributed, is not before the court and is therefore not determined. Nor does the court pass upon the question of whether any moral obligation exists.

Attention is called to the fact that a suit is pending in the United States District Court for the District of Columbia (Thompson et al. v. Deal et al., 67 App. D.C. 327, 92 F.2d 478) on similar facts against the pool manager to recover from him as manager of the pool.

Attention is also called to the fact that the Congress in 1938 made provision for a refund to all those who had paid the tax in money, 52 Stat. 1114. No provision was made in such measure for the use of the fund to pay those who had purchased tax-exemption certificates.

Accordingly the plaintiff's petition should be dismissed.

It is so ordered.

It is further ordered that the special findings of fact and conclusion of law and the accompanying opinion of the court be transmitted to the Senate in accordance with the Act of March 3, 1911, 36 Stat. 1087, 1138, Sec. 151, Judicial Code, 28 U.S.C.A. § 257, amending the Act of March 3, 1887, 24 Stat 505, 507.

WHALEY, Chief Justice, and LITTLETON, Judge, concur.

MADDEN, Judge (concurring).

I concur in the result for the reasons which I have expressed in my concurring opinion in the Crain and Wilson v. United States case, No. 45300, 44 F.Supp. 321, decided this date reading as follows: "I concur in the result reached by the Court. I would place that result upon the ground that no showing has been made to us sufficient to overcome the presumed constitutionality of the Bankhead Act. Since the invalidity of that Act is the major premise of plaintiff's claim, I think we are not faced with the question of whether or not the exaction which plaintiff seeks to recover is a tax, or whether, tax or something else, it would be recoverable if it had

---

[2] B. A. 190, September 5, 1934.

334

been illegally exacted. I would, therefore, not decide those questions."

WHITAKER, Judge (dissenting).

I dissent for the reasons stated in my dissenting opinion in Crain and Wilson v. United States, No. 45300, this day decided, reading as follows:

"I am unable to agree with the majority. I think the demurrer should be overruled.

"The purpose of the Bankhead Cotton Control Act was to restrict the production of cotton, not to raise revenue; but it sought to accomplish this purpose through the exercise of the taxing power. In order to restrict the production of cotton, it levied a prohibitive tax on cotton produced in excess of the farmer's quota.

"It made provision for satisfying this tax in two ways: (1) by payment of it in money; or (2) by payment of it in tax-exemption certificates, which could be purchased from a farmer who had not raised his quota, either directly or through the pool; but, whether the tax was satisfied in money or in certificates, it was liability for a tax that was discharged. Whatever it cost a taxpayer to discharge his liability for the tax, I think he is entitled to recover.

"It makes no difference that the defendant received no pecuniary benefit from the transaction. It was not looking for pecuniary benefit. It was seeking the restriction of the production of cotton. This result was accomplished. To accomplish it cost the plaintiffs the sum for which they sue. It was a sum exacted from them under the taxing power of the defendant. As Justice Sutherland said in United States v. Updike, 281 U.S. 489, 494, 50 S.Ct. 367, 369, 74 L.Ed. 984, 'Certainly it would be hard to convince such a person that he had not paid a tax.' See, also, Stahmann v. Vidal, 305 U.S. 61, 59 S.Ct. 41, 83 L.Ed. 41.

"If the allegation in the petition that the Act was unconstitutional is true, I think it states a good cause of action and that the demurrer should be overruled.

"I have no doubt that it was unconstitutional under the authority of the Butler[1] case. Both the Bankhead Act and the first Agricultural Adjustment Act contained exactly the same vices denounced by the Supreme Court in that case.

"The Fifth Circuit Court of Appeals held the Act unconstitutional in United States v. Moor, 93 F.2d 422, as did also the Court of Appeals for the District of Columbia in Thompson v. Deal, 67 App. D.C. 327, 92 F.2d 478. In Stahmann v. Vidal, supra, the Supreme Court assumed, but did not decide, it to be unconstitutional.

"The taxes having been exacted under an unconstitutional statute, I think the plaintiffs are entitled to recover if the allegations of their petition are proven.

"Wherefore, I think the demurrer should be overruled."

