238 P.2d 1102

BURGESS, Agricultural Prorate Com'r

v. HEARSH et al.

No. 5411.

Supreme Court of Arizona.

Dec. 26, 1951.

Rehearing Denied May 27, 1952.

Fred O. Wilson, Atty. Gen., Earl Anderson, Asst. Atty. Gen. (Mark Wilmer, Phoenix, of counsel), for appellant.

Ivan McDaniel, of Los Angeles, Cal., and Henry F. Colman, of Yuma, for appellees.

STANFORD, Justice.

This action was originally filed in the lower court by plaintiff, P. S. Burgess, as Agricultural Commissioner of the State of Arizona, asking that the defendants, grapefruit growers, be enjoined from violating

the provisions of the grapefruit prorate program, established by the Proration Program Committee in 1944 and amended in 1947, purportedly under the authority of the Arizona Agricultural Prorate Act of 1939, article 8 of chapter 49, A.C.A. 1939, as amended, hereinafter referred to as the "Act". By stipulation of the parties, plaintiff thereafter filed an amended complaint asking only declaratory relief determining the validity of the Act and the grapefruit prorate program as amended in 1947, instituted thereunder, for the purpose of regulating the marketing of grapefruit produced in Arizona.

After trial, the defendants were awarded judgment, and from that judgment this appeal is taken.

Although there were several questions raised in the lower court concerning the validity of the procedure used in the adoption of the amendment to the grapefruit prorate program in 1947, as well as the constitutionality of the Act, the only determination made by the lower court was confined to the validity of the program itself—(assuming the validity of the Act), and it is admitted in the briefs of both parties that this is the only issue confronting us in this appeal.

The Act, in addition to providing for the creation of a commissioner and the appointment of a prorate committee to administer the program, also contains the following pertinent sections:

"49–817. Powers of program committee. —(a) In any marketing program approved by the commissioner, or declared by him to be instituted, the program committee shall have power to determine the method, manner, and extend [extent] of proration, and the movement of the prorated commodity, or of any grade, size, or quality thereof, from harvest into a primary channel of trade. Proration may be periodic or seasonal in character and may be based upon actual production, whether in storage or otherwise, or upon estimated production. The estimated production shall be subject to revision by the committee in accordance with crop and market conditions. * * *

"(b) For the purpose of minimizing the effect of existing surpluses upon market conditions, the program committee shall have power:

* * * * * *

"(8) To establish and apply methods of equating the marketable supply . of any grade, quality, or size of any commodity to the reasonable market demands therefor."

"49–818. Proration certificates.—(a) After a proration program has been formulated and approved by the commissioner, or declared by him to be instituted, the agent for the zone shall assume administration of the program and subsequent modifications thereof and the issuance of proration certificates thereunder.

"(b) Proration certificates are divided into primary and secondary certificates. Each producer is entitled to one [1] primary certificate, which shall indicate: 1. the quantities of the commodity for which the program has been instituted which the producer named in the certificate is entitled to harvest or otherwise prepare for market and delivery into primary channels of trade; and, 2. from time to time, the number of secondary certificates theretofore issued under it.

"(c) Secondary certificates shall be numbered consecutively, and shall be used to control the time and volume of harvesting or other preparation for disposal. * *"

In 1944 various grapefruit growers throughout the state of Arizona, including defendant Irwin Hearsh, filed a petition with the plaintiff, as agricultural prorate commissioner, asking for the institution of a program of prorated marketing and the establishment of a proration zone with respect to grapefruit produced in the state of Arizona, based on grade and size control. Thereafter, a program was adopted and instituted, in accordance with the provisions of the Act, affecting all grapefruit produced in Arizona and shipped intrastate.

In 1947, the prorate committee formulated a proposed modification or amendment to the program, which included volume regulation as well as grade and size regulation, to be imposed on all fruit produced in Arizona, whether eventually shipped intrastate or interstate. The proposed addition to the program pertaining to volume regulation provided that the committee "shall limit the amount of fresh fruit which may be released into primary channels of fresh fruit trade in such manner and to such extent as may be necessary to effectuate the purpose of the Act * * *." Provisions were also included establishing marketing zones through which the regulations were to be effectuated. Zone "A", regulation of which concerns defendants herein, includes Arizona and California. Zones "B", "C", and "D" were also established, including the remainder of the United States and foreign countries.

After hearings were held on the proposed modifications and amendments, and the approval of the growers obtained through a referendum in accordance with the provisions of the Act, the modified grapefruit program was instituted and the volume control put into effect. Thereafter primary and secondary certificates were issued to all growers as provided for in the Act, section 49-818, supra.

Defendants are producers of grapefruit in the Yuma Valley area. All of their fruit is shipped into California; none is sold in Arizona. In addition to growing the fruit, they also harvest, pack, ship and dispose of all such fruit themselves. They maintain their own packing sheds, trucks for shipping and warehouses in California for storing the fruit.

In the latter part of 1947, the prorate committee, following their investigation of market conditions as prescribed by the provisions of the program, duly issued primary certificates to the various grapefruit producers throughout the state and thereafter periodically issued secondary certificates in accordance with section 49–818 of the Act, supra.

Plaintiff's original complaint alleged that defendants had released more fruit into the primary channels of fresh fruit trade than were authorized by their secondary certificates, asking that defendants be prohibited from further violating the restrictions of the program. Through stipulation of the parties the complaint was amended, asking for a declaratory judgment determining the said program to be valid in all respects and also declaring the rights of the respective parties thereunder in accordance with certain contentions set forth therein. The judgment of the trial court decreed only that the volume regulation of said program and all parts of the program connected with volume regulation are illegal and void as an unauthorized regulation of interstate commerce and in excess of the authority conferred under the provisions of the Act.

Appellant makes seven assignments of error which may be summarized in the contention that the judgment of the lower court is not supported by the evidence and is contrary to the law for the following reasons: (1) the program is in all respects duly authorized by the provisions of the Act; (2) the regulations imposed by the program are imposed on the fruit before it enters into interstate commerce and therefore does not constitute a burden on, nor an interference with interstate commerce; and (3) there is no evidence showing that the federal government has occupied the regulatory field, in which the program functions, to the exclusion of state control. Our discussion here will follow the points of contention as summarized above and in the order there set forth.

Concerning the first point, although the lower court held that the volume regulation of the program constituted regulation in excess of the authority granted by the Act, there is no contention made in the brief of appellees that this is true and no authority is cited in support thereof. In section 49–817, supra, it will be noted that the committee is given the power to determine *method, manner and extent* of proration and the movement of the commodity from harvest into a primary channel of trade. In subsection (8) of the same section it has the power to establish and apply methods of equating the marketable supply of the commodity. Section 49–818, supra, also provides for the issuing of primary and secondary certificates; primary certificates are to indicate the *quantities* of the commodity to be harvested or otherwise prepared for market while the secondary certificates are to control the *time and volume* of harvesting or preparing for

market. We can see nothing in the administration of the volume controls of the prorate program under discussion here which exceeds authority specifically set forth in the provisions of the Act, and we so hold.

 Concerning point number two above, the essence of the volume regulation provisions imposed by the program is contained in article III, section D(a) thereof, as follows: "Based upon such investigation, the report of the Committee and its findings and other pertinent data, if the Committee finds that the issuance of volume regulations with respect to grapefruit is necessary and proper and will tend to effectuate the declared purposes of the Act, it shall issue such volume regulations for a specified period or periods and shall limit the releasing in a primary channel of trade of such grapefruit, for consumption as fresh fruit, to that which complies with such volume regulations. In imposing such volume regulations the Committee shall limit the amount of fresh fruit which may be released into primary channels of fresh fruit trade in such manner and to such extent as may be necessary to effectuate the purpose of the Act and to prevent and tend to prevent glutting of the market for such fresh fruit and consequent loss of a fair return to the producer for such fresh fruit. * * *"

It is noted that the above provisions merely authorize the limitation while the method of exercising the limitation is provided in subsection (c) of the same section: "The Committee, in accordance with its finding as to the equitable distribution of allowable production as between Yuma Valley and Salt River Valley, shall from time to time determine the volume of grapefruit which may be released into primary channels of fresh fruit trade for any period or periods for consumption in any zone and shall thereupon authorize the issuance of secondary certificates to each producer permitting such producer or his assignee to release into such channels of trade for consumption in such zone the proper proportion of his allowable annual production as established by the primary certificate of such grower."

Referring back to section 49–818 of the Act, supra, we find that primary certificates are used to indicate "the *quantities* of the commodity * * * which the producer named in the certificate is entitled to *harvest* or otherwise prepare for market and delivery into primary channels of trade", while secondary certificates "shall be used to control the *time and volume* of *harvesting* or other preparation for disposal." (Emphasis supplied.) Admittedly, grapefruit marketed by defendants have to undergo no processing or preparation before use by the consumer; they are ready for consumption at the time of picking. Therefore in this case the primary and secondary certificates are to be used to control the harvesting of fruit which is released into primary channels of fresh fruit trade.

Certainly it cannot be said that grapefruit hanging on the trees prior to harvest has entered the flow of interstate commerce, merely by virtue of its ultimate destiny. The growing of agricultural products is not in itself interstate commerce, and there must be some act which places the product into interstate commerce before it can be so classified. Kidd v. Pearson, 128 U.S. 1, 9 S.Ct. 6, 32 L.Ed. 346; United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430. Clearly, the prorate program was here established to enable the committee, under circumstances such as we have in the present case, to control the grapefruit marketing process at the *first* stage of the journey, which ends ultimately at the door of the consumer. The case of Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 318, 87 L.Ed. 315, established the validity of the 1940–41 Raisin Program (instituted under the California Agricultural Prorate Act), similar to the regulation with which we are here concerned, wherein the marketing of raisins was controlled by an administrative body and procedures similar to those here discussed. Citing extensive authority establishing a general rule regarding state regulation the United States Supreme Court said: "All of these cases proceed on the ground that the taxation or regulation involved, however drastically it may affect interstate commerce, is nevertheless not prohibited by the Commerce Clause where the regulation is imposed before any operation of interstate commerce occurs. Applying that test, the regulation here controls the disposition, including the sale and purchase, of raisins before they are processed and packed preparatory to interstate sale and shipment. The regulation is thus applied to transactions wholly intrastate before the raisins are ready for shipment in interstate commerce."

Similarly, the regulation is here imposed before the fruit actually enters the stream of interstate commerce, therefore does not unduly burden interstate commerce.

The remaining question,—that of whether the federal government has occupied the regulatory field in which the present prorate program operates, to the exclusion of state control—while not made a basis for the judgment in the lower court, is nevertheless fully briefed by both parties. And, although the learned trial judge expressed his opinion (in a lengthy statement of decision which accompanied the judgment) that the state controls here imposed were not in conflict with federal regulation, we too will express ourselves briefly on this point.

██ The question here involves the Agricultural Marketing Agreement Act of 1937, 7 U.S.C.A. § 601 et seq., and agreements adopted thereunder. This Act authorized the Secretary of Agriculture to issue orders limiting the quantity of specified agricultural products, or of any grade, size or quality thereof, which may be shipped by handlers, in accordance with specified provisions. Action has been taken

by the Secretary under these provisions in the form of Marketing Agreement No. 96, and Order No. 55, issued by the Department of Agriculture, for the purpose of regulating size and grades of grapefruit but impose no regulations pertaining to volume. These particulars together with evidence in the record showing that the federal regulations and state regulations are administered in conjunction with each other, foster our opinion that there is no conflict in the two fields of regulation and that the state regulations constitute a valid exercise of state power.

In conclusion, we feel it is appropriate to again quote briefly from the language of the supreme court in Parker v. Brown, supra: "Such regulations by the state are to be sustained, not because they are 'indirect' rather than 'direct', [citing cases] not because they control interstate activities in such a manner as only to affect the commerce rather than to command its operations. But they are to be upheld because upon a consideration of all the relevant facts and circumstances it appears that the matter is one which may appropriately be regulated in the interest of the safety, health and well-being of local communities, and which, because of its local character and practical difficulties involved, may never be adequately dealt with by Congress. Because of its local character also there may be wide scope for local regulation without substantially impairing the national interest in the regulation of commerce by a single authority and without materially obstructing the free flow of commerce, which were the principal objects sought to be secured by the Commerce Clause. [citing cases] There may also be, as in the present case, local regulations whose effect upon the national commerce is such as not to conflict but to coincide with a policy which Congress has established with respect to it."

Judgment reversed.

UDALL, C. J., and DE CONCINI and LA PRADE, JJ., concur.

PHELPS, Justice (dissenting).

I am strongly of the view that insofar as the program order here involved attempts to impose or has the effect of imposing a restriction upon appellees' shipment of his grapefruit into California results in (using the language of the learned trial judge) "an intrusion of the state's power into an unauthorized field and therefore cannot be sustained."

Regardless of the language employed in the order, it is clearly manifest that its purpose and its effect is to restrict the flow of interstate commerce between Arizona and California by limiting the number of boxes of grapefruit appellees may harvest for shipment into the California markets over a given period.