UNITED STATES of America
v.
Denneth BASS, Defendant.
No. 69 Cr. 881.

United States District Court,
S. D. New York.
Feb. 19, 1970.

Robt. M. Morgenthau, U. S. Atty., for the Southern District of New York, Thomas J. Fitzpatrick, Asst. U. S. Atty., of counsel for the Government.

Lawrence Kessler, New York City, for defendant.

## MEMORANDUM

FRANKEL, District Judge.

Defendant has been found guilty by a jury under two counts of an indictment charging that on two specified occasions, having been previously convicted of a state felony, he possessed a firearm, thus violating 18 U.S.C. App. § 1202(a)(1). That statute says in pertinent part:

"Any person who * * * has been convicted by a court of the United States or of a State or any political subdivision thereof of a felony * * * and who receives, possesses, or transports in commerce or affecting commerce, after the date of enactment of this Act, any firearm shall be fined not more than $10,000 or imprisoned for not more than two years, or both."

It was stipulated that defendant had been convicted in the Supreme Court of New York, Bronx County, on or about February 1, 1968, of attempted grand larceny in the second degree, a felony. Thereafter, it was proved, on July 29 and July 30, 1969, he had in his possession a firearm, a pistol and then a shotgun, respectively.

There was no allegation in the indictment and no attempt by the prosecution to show that the possession of the firearm on either occasion transpired "in commerce or affecting commerce * *." The absence of this element, defendant now urges, vitiates the conviction. Contending that the statute was intended to reach possession of firearms by convicted felons only if such possession was shown in fact to be "in commerce or affecting commerce," he moves for an order in arrest of judgment or for a judgment of acquittal.

For reasons which follow, the court holds erroneous the statutory construction upon which the motion is predicated.

To begin with, there is some modest, if by no means decisive, force in the government's grammatical analysis of the statutory text. The words "in commerce or affecting commerce" follow "transports," not "possesses," and there are words of approval in the books for the canon that such qualifying phrases, especially where the commas are arrayed like those here in question, should be deemed to relate only to the last antecedent. See F. T. C. v. Mandel Brothers, 359 U.S. 385, 389–390, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959); T. I. McCormack Trucking Co. v. United States, 298 F. Supp. 39, 41 (D.N.J.1969); 2 Sutherland, Statutory Construction § 4921 (3rd ed. 1943). As is often the case, however, see K. Llewellyn, The Common Law Tradition 522–28 (1960), there is a contradictory canon in defendant's arsenal: "When several words are followed by a clause which is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all." Porto Rico Ry. Light & Power Co. v. Mor, 253 U.S. 345, 348, 40 S.Ct. 516, 64 L.Ed. 944 (1920); United States v. Standard Brewery, 251 U.S. 210, 218, 40 S.Ct. 139, 64 L.Ed. 229 (1920); Buscaglia v. Bowie, 139 F.2d 294, 296 (1st Cir. 1943); 2 Sutherland, loc. cit. supra.

Here, as elsewhere, then, the battle of canons and commas leaves us to seek for clues more promising to the legislative meaning.

The more substantial indicia in the statutory language and the pertinent, if somewhat sketchy, items of legislative history serve in total effect to refute defendant's argument. When the statute before us was enacted, the Congress and its constituencies were deeply disturbed by a recent history of horrible assassinations. At the same time the economic and human costs of individual and "organized" lawlessness were subjects of highly vocal concern. In that setting, the legislative findings are promptly intelligible and apposite here. The statute reported, inter alia, these centrally significant judgments of legislative fact:

"* * * that the receipt, possession, or transportation of a firearm by felons, veterans who are other than honorably discharged, mental incompetents, aliens who are illegally in the

country, and former citizens who have renounced their citizenship, constitutes—

(1) a burden on commerce or threat affecting the free flow of commerce, [and]

(2) a threat to the safety of the President of the United States and Vice President of the United States * * *."

Both of the evils thus identified could be mitigated, and were intended to be mitigated, by forbidding possession of firearms to the specified classes of specially risky people, regardless of whether the possession itself occurred "in commerce or affecting commerce * * *." As was said by Senator Russell Long, sponsor of the amendment which became Title VII of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L.No. 90–351, 82 Stat. 197: [1]

" * * * Congress simply finds that the possession of these weapons by the wrong kind of people is either a burden on commerce or a threat that affects the free flow of commerce.

"You cannot do business in an area, and you certainly cannot do as much of it and do it as well as you like, if in order to do business you have to go through a street where there are burglars, murderers, and arsonists armed to the teeth against innocent citizens. So the threat certainly affects the free flow of commerce." 114 Cong.Rec. 13,869 (1968).

Similarly, the recent deaths by gunshot of a President, a presidential candidate and a national civil rights leader gave tragic testimony that disturbed people carrying weapons did not have to cross state lines to pose grave threats with which the national government had occasion (and power) to cope. [2] See,

---

[1.] Sections 1201 and 1202 of Title 18 U.S.C.App. were enacted as Title VII of the Omnibus Crime Control and Safe Streets Act. The bill which (after thorough transformation) became that Act, H.R. 5037, 90th Cong., 1st Sess., started its legislative career as a measure designed to aid state and local governments in law enforcement by financial and administrative assistance. See H.R.Rep. No. 488, 90th Cong., 1st Sess. (July 17, 1967). This bill passed the House August 8, 1967, and went to the Senate. A similar bill was introduced in the Senate (S. 917) and went to the Committee on the Judiciary, which rewrote it completely. See S.Rep. No. 1097, 90th Cong., 2d Sess. (April 29, 1968). The amendments included much debated provisions regarding the admissibility of confessions, wiretapping and state firearms control.

On May 17, 1968, Senator Long introduced on the floor his amendment to S. 917, which he designated Title VII. His introductory remarks set forth the purpose of the amendment. 114 Cong.Rec. 13,867–69. About a week later he explained once again the proposed effect of the addition. There was brief debate; the reaction appeared favorable but cautious. Unexpectedly, however, there was a call for a vote, and Title VII passed without amendment or extended discussion. See 114 Cong.Rec. 14,772–75 (1968).

The same day the Senate agreed to strike out the language of H.R. 5037 and substitute the text of S. 917 as amended. Following this, the new H.R. 5037 was passed by the Senate. The House passed it then on June 6, 1968, 114 Cong.Rec. 16,271–300, and it was signed by the President on June 19, 1968.

[2.] Senator Russell Long:

" * * * we clearly have a right to protect the life of the President of the United States. What happened with regard to the assassination of President Kennedy is a very good example. So we set forth that the possession of weapons by people of the type I have described—a description broad enough to include Mr. Oswald—would be a threat to the safety of the President of the United States and a threat to the Vice President of the United States. We employ many Secret Service agents to protect the lives of the President and the Vice President from people of that sort. We have passed a law making it a Federal crime for one to assassinate the President. If we have a right to pass that law, we certainly have a right to take measures to protect the lives of the President and the Vice President.

"Then we say that the possession and transportation of firearms by these people is an impediment or a threat to the exercise of free speech and to the exercise of religion guaranteed by the

e. g., 114 Cong.Rec. 13,868–13,871, 14,-772–14,775 (1968) (Sen. Long); 114 Cong.Rec. 16,297 (1968) (Cong. Pollock).

There is no need at this date in our history to document at length the power of Congress to reach intrastate occurrences which, in their voluminous and cumulative impact, may or do threaten the course of interstate commerce. See Heart of Atlanta Motel v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942); United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941); White v. United States, 395 F.2d 5 (1st Cir.), cert. denied, 393 U.S. 928, 89 S.Ct. 260, 21 L.Ed.2d 266 (1968); White v. United States, 399 F.2d 813 (8th Cir. 1968). It is equally unnecessary to labor over the power to strike at dangers to the President or other federal officials whose security is a matter of "overwhelming" national concern. Watts v. United States, 394 U.S. 705, 707, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969); In re Neagle, 135 U.S. 1, 59, 10 S.Ct. 658, 34 L.Ed. 55 (1890). The defendant does not quite say, but tentatively hints, that there may be constitutional doubts about the statute as it has been defined to apply to his case.

first amendment to the Constitution of the United States. That clause, of course, could clearly pertain to this Government's right to protect citizens, such as Martin Luther King, who are expressing either religious or political views and whose life might be endangered because someone did not agree with what they were saying." 114 Cong.Rec. 13,869 (1968).

" * * * this would make it apply to the gun Oswald had with which he killed John F. Kennedy.

"It would mean that Oswald * * * would not have had the right to carry that gun or practice with it or do anything else with it.

"Assuming that * * * this man Galt—a loser many times over, a felon, and an habitual criminal—was the man

The court perceives no solid basis for such doubts.

It is concluded that the Congress could and did mean to reach cases like this one. Accordingly, defendant's motion is denied.

So ordered.

who killed Martin Luther King, this provision would have applied to him, too." 114 Cong.Rec. 14,773 (1968). "While this, of course, could not have saved every person who has been assassinated—certainly, it would not have saved my father—at the same time, it would apply to many of the most fiendish assassinations that have occurred in our time." 114 Cong.Rec. 14,774 (1968).

Congressman Pollock:

" * * * we in this august body are faced with a somber and determined mood and temper of the Nation in the wake of riots and of the brutal, senseless slayings of Senator Robert F. Kennedy and Dr. Martin Luther King, a collective mood and temper which demand action * * *." 114 Cong. Rec. 16,297 (1968).