GILL v. ELECTRO MANGANESE CORPORATION.

(*Knoxville*, September Term, 1941.)

Opinion filed January 13, 1941.

W. O. LOWE, of Knoxville, for appellant.

LEN G. BROUGHTON, of Knoxville, for appellee.

MR. JUSTICE MCKINNEY delivered the opinion of the Court.

Complainant was employed by defendant at its plant in Knoxville from May 20, 1939, to October 21, 1939, as a day laborer. It is the insistence of complainant that during that period defendant was engaged in the production of goods for interstate commerce so as to bring its employees within the provisions of the "Fair Labor Standards Act of 1938, 29 U. S. C. A., section 201 et seq.," and that he is entitled to the compensation provided therein.

Section 203(b) of the Act provides:

" 'Commerce' means trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof."

Section 206(a) is in this language:

"Every employer shall pay to each of his employees who is engaged in commerce or in the production of goods for commerce wages at the following rates . . ."

Section 207 contains a table of maximum hours of service by employees.

This cause was heard upon a stipulation of facts, the substance thereof being as follows: The defendant was incorporated under the laws of Tennessee in 1938, its situs being in Knox County. Its purpose was to equip an experimental manufacturing plant to experiment with and develop a patent owned and controlled by the Department of the Interior of the United States, which patent covered a new and heretofore unknown process by which manganese has heretofore been produced by the use of intensely high heat brought about by coal and other similar combustibles. Several attempts have heretofore been made to produce manganese by electricity but without success. The site in Knoxville was selected because it was within the Tennessee Valley area; and if said process should be successful, defendant would become a large consumer of electricity at a saving in electrical

charges. Manganese, to be accepted commercially, must be not less than $99\frac{9}{10}$ per cent pure.

Defendant began remodeling the building to be used in December, 1938, and began installing machinery in January following. The first trial run was in May, 1939, it was a failure. During the months of May, June, July, August, and September, 1939, the plant was wholly within the experimental stage, and no manganese produced in those months came up to the required commercial standard; none of it was sold, but all of it was to be destroyed. All of the manganese ore was purchased within the State of Tennessee. No business was solicited prior to October, 1939, due to the fact that it was not known up to said date whether or not the experiment would be a success.

It was ascertained during the first week of October, 1939, that the process had been perfected; thereupon defendant directed that all of its employees as of October 1, 1939, should be paid in compliance with the Fair Labor Standards Act, and complainant and other employees were paid accordingly.

From and after October 1, 1939, defendant began manufacturing manganese for sale and up to January 31, 1940, had sold 5,625 pounds.

Section 12 of the stipulation is as follows:

"At the time the defendant was incorporated, to-wit, in December, 1938, and began remodeling the building located in Knox County, Tennessee, it was the purpose and intention of the defendant, if manganese of not less than a purity of $99\frac{9}{10}$ per cent was developed, to manufacture manganese for commercial sale in interstate commerce, but it was the purpose and intention of the defendant that if manganese could not be produced at the afore-mentioned purity of $99\frac{9}{10}$ per cent, that the de-

fendant would not engage in the manufacture and sale of manganese in interstate commerce."

Upon the foregoing facts the chancellor held that prior to October 1, 1939, defendant was not engaged in commerce or in the production of goods for commerce within the meaning of the Fair Labor Standards Act and dismissed the bill. In this conclusion we concur. It is stated in the stipulation "that during the months of May, June, July, August and September of 1939, the plant was wholly within the experimental stage, and no manganese produced during the aforesaid months was within the commercial standard of $99\%_{10}$ per cent pure." And under section 12 of the stipulation it is stated that defendant did not intend to engage in the manufacture and sale of manganese in interstate commerce until it had developed a product of $99\%_{10}$ per cent purity. We think there is a clear distinction between experimenting in an attempt to produce or to discover a desired commodity or remedy and manufacturing that article or remedy for commercial purposes after it has been perfected. Henry Ford, when experimenting in his workshop in an attempt to produce a machine to be operated by gasoline, could hardly be said to be engaged in commerce; although, after he had completed and perfected his famous engine, he did engage in commerce on a very large scale.

For many years chemists have been laboring in laboratories in an attempt to find a remedy for the cure of cancer, with an intention of manufacturing and selling it commercially when discovered. But it would be absurd to say that these chemists are engaged in commerce or in the production of goods for commerce.

The distinction we have attempted to draw is illustrated in an article appearing on page 12 of Pathfinder of De-

cember 7, 1940, under the title "Science," from which we quote the following:

"For more than half a century, science has vainly tried to produce crystallized sugar from sorghum, the transplanted African grass which in one variety yields broomstraw, and in another both silage and sorghum syrup. Today the problem has been conquered, the Agriculture Department reports—though, it hastily adds, sorghum sugar is not yet in the commercial stage."

In this particular cause defendant paid complainant the minimum wage provided in the Fair Labor Standards Act, but did not pay him the 50 per cent increase for excess time, as provided in the act, until it began manufacturing manganese commercially after October 1, 1939.

We find no error in the decree of the chancellor, and it will be affirmed.