## LOFTHER et al. v. FIRST NAT. BANK OF CHICAGO.

### No. 3320.

District Court, N. D. Illinois, E. D.

Oct. 17, 1942.

Abraham W. Brussell, of Chicago, Ill., for plaintiffs.

Amberg, Livingston, Kearns & Dahlin, of Chicago, Ill., for defendant.

SULLIVAN, District Judge.

On October 16, 1941, this cause was before me on a motion to strike certain portions of the original complaint, which motion, so far as it referred to claims of persons other than the individuals named as plaintiffs, was allowed, and the suit was permitted to "proceed on behalf of the present named plaintiffs, and all others who show that they are 'similarly situated' and indicate that they desire to join with the named plaintiffs as parties to this action, or to intervene, or who designate an agent or representative to maintain such action on their behalf." 45 F.Supp. 986, 990.

November 5, 1941, defendant First National Bank, filed its answer to the complaint as modified by the order of October 16th, 1941, in which answer it denied practically all of the material allegations.

February 9, 1942, an amended complaint was filed, naming additional parties as plaintiffs. On the same day a stipulation of facts as well as a supplemental stipulation of facts were filed.

Defendant's motion for Bill of Particulars was denied.

The cause is now before the court on the issues raised by the complaint, as amended, defendant's answer as amended, the stipulation and supplemental stipulation of facts. The case was argued orally before the court, briefs have been filed by both parties, and, on leave of court, by the Administrator of the Wage and Hour Division of the United States Department of Labor, as amicus curiae.

Section 41(8), Title 28 U.S.C.A. confers upon the District Court original jurisdiction of all suits and proceedings arising under any law regulating commerce, as does also Section 16(b) of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 216 (b).

The two main issues which the court is called upon to decide are whether or not plaintiffs, who are elevator operators, janitors and one watchman, are (1) "engaged in commerce," or (2) "the production of goods for commerce," so as to be entitled to claim from defendant under the Wage and Hour Law of 1938, Title 29 U.S.C.A. § 201 et seq., various sums alleged to be due them for overtime.

Plaintiffs claim that they are engaged both in commerce and in the production of goods for commerce within the meaning of Section 7 of the Act which became effective October 1, 1938.

Section 7(a) provides:

"No employer shall, except as otherwise provided in this section, employ any of his employees who is engaged in commerce or in the production of goods for commerce—

"(1) for a workweek longer than forty-four hours during the first year from the effective date of this section,

"(2) for a workweek longer than forty-two hours during the second year from such date, or

"(3) for a workweek longer than forty hours after the expiration of the second year from such date, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

Section 3(b) defines "commerce" as "trade, commerce, transportation, transmission, or communication among the several States."

Section 3(j) defines "produced" as "'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this Act [chapter] an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any State."

Section 3(i) defines "goods" thus: "'Goods' means goods (including ships and marine equipment), wares, products, commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof, but does not include goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof."

Defendant is a national banking association, chartered under the National Banking Act of 1864, 13 Stat. 99. It owns, operates and manages an eighteen story building located at No. 38 South Dearborn Street in the City of Chicago. The first four floors of the building, together with portions of

the vaults located in the basement and sub-basement, are occupied by· the defendant and used for its customary banking activities. The eighteenth floor is used by it as a restaurant for its employees. The remainder of the building is rented by defendant to various tenants for office purposes, among whom are the Chicago Ordnance District of the United States War Department, Inland Steel, Western Union Telegraph Company, Railway Business Association, Chamber of Commerce of the United States, National Association of Credit Men and Investment Bankers Association of America. Approximately 6,500 people have working quarters in the building, 2,500 of whom are employed by defendant. Defendant, under its agreements with its tenants is required to clean and heat the building and furnish elevator service. Plaintiffs are employed as elevator operators and janitors, except one who is employed as a watchman, and their contract of employment, wherein they agree to serve this office building, is a part of the leasehold contract between defendant and its tenants, and is an incident to the relationship of landlord and tenant. It is stipulated that prior to January 1st, 1939, defendant paid its janitorial employees a monthly salary based upon a forty-eight hour week, with no provision for overtime. This arrangement was succeeded by a written Union agreement dated December 17th, 1938, effective January 1st, 1939, to December 31st, 1943, establishing new wage schedules with their hourly equivalent, but retaining the forty-eight hour work-week, with a proviso that time and one-half should be paid for work in excess of forty-eight hours, computed on the basis of forty-four hours per week at the hourly rates indicated, plus four hours at one and one-half times said hourly rate. The wages thus established were increased by a supplemental agreement dated October 6th, 1941, all other provisions of the agreement of December 17th, 1938, remaining in full force and effect.

The wages and hours for elevator operators and starters, and the one watchman, prior to July 1st, 1939, were fixed by a Union agreement dated December 5, 1935, calling for a forty-eight hour work-week, and providing that Sunday and Holiday work should be paid for at the rate of time and one-half, but with no provision for work in excess of forty-eight hours in any work-week. On May 25th, 1939, a new agreement was executed, effective July 1st, 1939, to June 30th, 1942, increasing the monthly scale and corresponding hourly rates, wherein it was provided that "the monthly wages are computed on the basis of forty-four hours per week at straight time, plus four hours at one and one-half time said hourly rate." Employees were allowed one week with pay, and Sunday and Holiday work was to be paid for at time and one-half, no mention being made of work in excess of forty-eight hours in any work-week. A supplemental agreement dated October 2nd, 1941, changed some of the monthly wage scales but did not otherwise affect the agreement of May 25th, 1939. Plaintiffs claim overtime compensation for overtime hours between forty-four and forty-eight for all time subsequent to the agreements effective January 1st, 1939, for janitors, and July 1st, 1939, for elevator operators.

Both sides agree that the Fair Labor Standards Act is predicated entirely and solely upon the nature of the employees' work, with complete emphasis placed on the type and nature of the work of the employee rather than upon the activities of the employer. Application of the Act is determined by the activities of each individual employee, not by the activities of the employer, and only those "employees * * * engaged in commerce or the production of goods for commerce" come within the terms of the Act. However, as this court on previous occasions has said, it is difficult to see how an employee can be engaged in interstate commerce, or in the production of goods for commerce, unless his employer is also so engaged. I am convinced that Congress, when it passed the Act, did not intend that the business in which the employer was engaged should be totally disregarded, and I have therefore given consideration to this aspect in the case at bar. When this legislation was under consideration, Senator Pepper said: (83 Congressional Record 9168)

"The power to affect those employed in interstate commerce is * * * definitely admitted * * *. Jurisdiction over employees engaged in the production of goods is * * * vital to the exercise of the power to regulate commerce. I want it distinctly stated that this proposed law is not applicable to all employees of an industry which itself is engaged in interstate commerce. It is applicable only to those employees who themselves are engaged in interstate commerce, or the pro-

duction of goods for interstate commerce, and the contrary theory was definitely rejected by the committee."

The first question then for the court to determine is as to the nature of plaintiffs' duties, and in arriving at a conclusion I am also keeping in mind the nature of the establishment where such duties are performed. What do these employees do? They operate the elevators and clean and patrol the halls and offices in an office building in downtown Chicago. While the elevators are operated primarily for the purpose of making access to the various offices more convenient, nevertheless I agree that their operation in a modern eighteen story office building is also a necessity if tenants are to reach their offices with the expenditure of a minimum amount of time and physical effort, but I do not agree that the business of the bank and of the various tenants is wholly dependent upon the operation of the elevators and the janitor service. The offices and halls are cleaned and the windows are washed in order that the occupants of the building and their visitors may have more healthful and pleasant surroundings, and the operation of the elevators permit them to reach their destinations quickly and comfortably, but plaintiffs have nothing to do with the operation of the bank as a bank, or with the business of the various tenants. I do not believe that the activities of an elevator operator or a janitor are activities or occupations which are essential or necessary to the carrying on of the banking business, or to the sale by the tenants of steel, or stocks or bonds, or the writing of a brief in a lawyer's office. Even if, as plaintiff insists, the necessity is an economic one rather than a physical one, the fact remains that plaintiffs' activities are services which contribute only to comfort and speed in reaching various portions of the building, and not activities which are economically essential or necessary to carrying on the banking business or the business of the individual tenants. In the case of Johnson v. Filstow, Inc., D.C., 43 F.Supp. 930, 932, the District Judge there, in disposing of a like question, said:

"If the plaintiff's contentions be sustained on the theory that sweeping the office is necessary to interstate commerce, it should not stop with the janitor. A janitor must wear clothes; it is necessary that he be clothed before he could enter the office and sweep it. Therefore, the merchant who sold him the clothes would be supplying an essential to interstate commerce. Or, if the janitor had on a shirt that was made by his wife for his use in sweeping, the wife would also be engaged in the production of goods for commerce. It is necessary for the janitor to eat, and if by chance he bought a hamburger from a restaurant, the restauranteur would be furnishing an essential in interstate commerce. And so on, ad infinitum. Reductio ad absurdum !"

Plaintiffs and the Administrator set out in their briefs various of the functions of defendant bank, such as receiving and transmitting drafts and bills of lading for merchandise transported in interstate and foreign commerce; dealing in foreign exchange; transferring money and credit; maintaining relations with and being in frequent contact with correspondent banks throughout the world; collecting checks, notes, drafts and coupons in all parts of the country; issuing letters of credit and travellers checks; and acting as corporate trustee. But it is nowhere shown that plaintiffs in any way perform or help to perform any of these functions, or have any connection with their performance. They never see or know of the existence of any of these documents, or how they are accounted for, further than that some of plaintiffs operate elevators which carry employees and customers of the bank to and from the floors occupied by it, as well as carrying the tenants and all persons who have business with them, to and from the various offices in the building. The employees who are engaged in carrying on the banking business of the bank may conceivably be engaged in interstate commerce, although I have not been able to find any cases holding directly that banks are engaged in interstate commerce. But elevator operators and janitors employed to carry tenants to and from their offices, and to sweep and clean those offices, activities entirely isolated from the banking business, cannot, by reason thereof, be held to be engaged in the interstate activities of the bank or of its tenants.

Plaintiffs also set out the names of several of the tenants and describe the interstate activities in which they are engaged, and contend that "although plaintiffs are employed by defendant bank, their activities keep them in contact not only with the bank's activities, but also with the tenants' activities." Such contact with the bank employees and the tenants is the same

sort of contact everyone experiences when riding in a crowded bus or street-car, or train, or even an elevator. It is the employees of the bank, actually engaged in carrying on the business of the bank who keep in touch with the bank's activities, in the sense of having knowledge of it; and the actual employees of each individual tenant who keep in touch with the tenants' activities. Suppose, for the sake of argument, that the leases of all of the tenants now occupying offices in the bank building were to expire the first of next year, and new tenants, all of whom were concededly engaged in intrastate activities were to rent office space there, would the interstate status of the janitors and elevator operators then become subject to the regulatory powers of the State to the exclusion of regulation by the Federal Government. Would the status of the employees be permitted to thus vacillate, according to whether or not the tenants were engaged in interstate commerce. I believe not.

Plaintiffs insist that it is their *work*, not their *duties*, which is determinative of whether or not they come under the Act, and urge that "to know the nature of plaintiffs' *work* requires an analysis and examination of the *work* of the persons or materials carried in the elevators, or the materials carried or handled by the janitors. That is, "it is necessary to know whose offices are cleaned, who uses the hallways, etc." Here again arises the question as to whether the status of the employees would change if the activities of the tenants changed from interstate to intrastate. I do not believe that Congress intended that any such strained interpretation should be given the Act as to cover elevator operators in an office building merely because some of the tenants are engaged in interstate commerce.

Section 2(a) of the Act covers "Findings and Declaration of Policy" and reads as follows:

"The Congress hereby finds that the existence, in industries engaged in commerce or in the production of goods for commerce, of labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers (1) causes commerce and the channels and instrumentalities of commerce to be used to spread and perpetuate such labor conditions among the workers of the several States; (2) burdens commerce and the free flow of goods in commerce; (3) constitutes an unfair method of competition in commerce; (4) leads to labor disputes burdening and obstructing commerce and the free flow of goods in commerce; and (5) interferes with the orderly and fair marketing of goods in commerce."

Section 2(b): "It is hereby declared to be the policy of this Act [sections 201–219 of this title], through the exercise by Congress of its power to regulate commerce among the several States, to correct and as rapidly as practicable to eliminate the conditions above referred to in such industries without substantially curtailing employment or earning power."

Section 3(h) defines "industry" thus: " 'Industry' means a trade, business, industry, or branch thereof, or group of industries, in which individuals are gainfully employed."

From this it is apparent that it is the purpose of the Act to eradicate from interstate commerce the evils attendant upon low wages and long hours of service in industry, and the Findings are confined to the elimination of substandard conditions in "industries" engaged in commerce, or in the production of goods for commerce. Nowhere in the Act is any reference made to conditions or transactions "affecting commerce," which term is used in the National Labor Relations Act and there defined, § 2(7), as meaning "in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce." It is necessary, therefore, to keep in mind the distinction between "interstate commerce" as used in the Fair Labor Standards Act, and transactions or conditions "affecting interstate commerce" as used in the National Labor Relations Act. Certainly, the operating of an elevator or the sweeping of floors or washing of windows is not of itself interstate commerce, and at most may be considered only as conditions or transactions affecting commerce. The Fair Labor Standards Act requires that the employees themselves must be either engaged in commerce or in the production of goods for commerce, not in activities or transactions which affect commerce. I am of the opinion that the controlling factor here is not the nature of the business in which the employer is engaged, but rather the

nature of the duties which the employees are called upon to perform.

Plaintiffs in the instant case admit that no goods are manufactured or produced on the premises, aside from correspondence, reports, statements, and other written materials received by and eminating from the offices of the bank and of the tenants, as described in paragraphs 6 and 9 of the Stipulation of Facts. Other than this, neither the defendant bank nor any of its tenants produce any goods on the premises. I agree with plaintiffs that "goods" as defined in the Act, includes written reports, statements, correspondence, accounts prepared by an accountant and his staff, briefs written by lawyers, etc., and in the instant case constitute the commerce or production of goods for commerce in which the bank and its employees, and the tenants and their employees, are engaged. It follows that it is any substandard labor conditions existing in this commerce or production of goods for commerce which the Act seeks to correct or eliminate. I am convinced that the janitors and elevator operators, by reason of their activities are not so engaged in this commerce or the production of these goods for commerce, as to bring them under the provisions of the Act; and this is not in conflict with the holding in either the case of A. B. Kirschbaum & Co. v. Walling, Administrator, or Arsenal Building Corporation v. Walling, Administrator, decided by the Supreme Court of the United States on June 1st, 1942, and reported in 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638. In both of those cases the employees actually handled the goods produced in the building and shipped in interstate commerce. They moved the goods up and down from story to story in their elevators, thus starting and finishing the interstate journey of the goods going to and from the tenants; furnished the light and power to drive the machines, as well as the heat, hot water and steam necessary to the manufacturing operations; cleaned the premises and swept from the floors large amounts of debris caused by the cutting and making of the garments. In the case at bar plaintiffs perform none of these activities.

In Cochran et al. v. Florida National Building Corporation, D.C., decided July 8th, 1942, and reported in 45 F.Supp. 830, 832, involving almost identical questions with those in the instant case, the court said:

"It has heretofore been held by this Court, and is its firm conviction, that the Fair Labor Standards Act does not attempt to regulate matters that merely affect that part of interstate commerce which is unconnected with manufacturing or the production of goods for commerce. The Act does not undertake to regulate matters that merely affect interstate commerce in the ordinary commercial or selling pursuits or in any respect other than in the manufacture of goods.

"I do not find anything said in the Kirschbaum case, supra, out of harmony with the views herein expressed, because that case dealt with the production of goods for commerce, and that term is broad enough to include any essential instrumentalities in the production of goods. The Act itself includes 'any process or occupation necessary to the production thereof.' "

Plaintiffs also urge that it is the economic effect of the performance of their mechanical duties which should be the object of this inquiry. That to simply say that these elevator operators run elevators is to give only part of the picture, because all persons carried on the elevators represent business transactions, which constitute interstate commerce to some extent; and that the elevator operators by reason of their contact with such persons should therefore be regarded as engaged in interstate commerce. And further, that all such persons so using the elevators in this office building are also engaged in commerce or the production of goods for commerce, and that plaintiffs again, by reason of their contact with them, are also engaged in commerce or the production of goods for commerce. The mere fact that these elevator operators, in the course of their duties, carry in their elevators persons whose business transactions may be construed as involving interstate commerce, as well as those whose business transactions are purely intrastate, has no such economic effect as would permit this court to hold that the operators, by reason of such contacts, were engaged in commerce or in the production of goods for commerce. Such a relationship, whether involving interstate or intrastate activities, is entirely too remote to even have any effect upon commerce. In United States v. Darby, 312 U.S. 119, 657, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430, the court held that Congress might, by appropriate legislation, as it did in the National Labor

698

Relations Act, regulate intrastate activities where they have a substantial effect on interstate commerce. Surely the activities here under consideration cannot be said to have any substantial effect on interstate commerce.

The Act was designed to abolish substandard labor conditions in industries engaged in commerce or the production of goods for commerce, by establishing a decent national level of working conditions. In the present case the agreements made by the defendant with these employees, through their respective Labor Unions, provided for compensation considerably above both the prescribed Union scale and the minimum rate provided in the Act, which rate, it was agreed, would cover both time and overtime, with time and one-half for certain specified holidays. To be sure the formula used for arriving at this computation was not the formula urged by the Administrator, but rather one agreed upon between the employer and its employees, and which met with the approval of the employees' respective Unions. Even if the activities of these employees could be construed as interstate commerce, it occurs to me that under their wage agreements there are no such substandard labor conditions involved as would deleteriously effect or burden interstate commerce, or constitute an unfair method of competition in commerce, or lead to labor disputes, or interfere with the orderly and fair marketing of goods in commerce, merely because the formula of the Administrator was not used as a basis for the computation. The Act was designed to correct certain social evils therein enumerated, and being remedial it must be liberally construed. Its objects and purposes are admirable but its penalties are severe, and upon the court rests the duty, in liberally construing it, to also see that it gives effect to the Congressional intent at the time the legislation was passed. After a careful consideration of the entire case, including the arguments of counsel, the briefs and all of the cases cited, I believe that Congress did not intend that the Act should be stretched and strained to cover every phase of human activity to the point of being unreasonable, but rather that it should be given a sensible and practical construction. There being no impelling authority to the contrary, I am of the opinion that Congress intended that the Act should apply only to such employees as are engaged in commerce or the production of goods for

commerce, as those phrases have been commonly understood. I therefore do not believe that plaintiffs in the instant case are covered by the Fair Labor Standards Act, and judgment is rendered accordingly.