RICHARD M. ATWATER, also known as RICHARD M. ATWATER, 3rd.,

*Plaintiff and Appellant,*

vs.

J. L. GAYLORD,

*Defendant and Respondent.*

(No. 2362; September 9, 1947; 184 Pac. (2d) 437)

For the Plaintiff and Appellant, the cause was submitted upon the brief and also oral argument of Louis Kabell, Jr., of Evanston, Wyoming.

For the Defendant and Respondent, the cause was submitted upon the brief of Patrick J. Quealy and Ivan S. Jones, both of Kemmerer, Wyoming, and oral argument by Mr. Jones.

494

498

## OPINION

BLUME, Justice.

The plaintiff, Richard M. Atwater, sued the defendant, J. L. Gaylord, for overtime, liquidated damages

and attorney's fees, pursuant to the Fair Labor Standards Act of Congress of 1938, 29 U. S. C. A., Sections 201 to 219, for work done by himself as a driller for an oil well, and as assignee of one George L. Brown, who also was employed as such driller. Atwater worked for the defendant in that capacity from March 11, 1944 to June 18, 1945, at a regular wage of $1.50 per hour. He claims $783.00 for overtime, an equal amount as liquidated damages, and attorney's fees of $300.00. Brown worked for the defendant as a driller for oil from August 20, 1944 to June 2, 1945, at a regular wage of $1.25 per hour. The amount of $342.75 is claimed for overtime on his behalf, an equal amount for liquidated damages and $150.00 for attorney's fees. Both Atwater and Brown have been paid the regular wages, and only the overtime, liquidated damages and attorney's fees are involved herein. It was stipulated by the parties that the number of hours of work, including the overtime claimed by the plaintiff and Brown, is correct. The trial court found for the defendant on all the issues herein, and the plaintiff has appealed.

The drilling was done on the West Half (W½) of Sec. 16, Township 14, Range 118 in Uinta County of this State. Gaylord claimed to do so as a joint adventurer, and by reasons of having some interest in the land, the nature of which interest does not appear. Gaylord had contracted to drill to a depth of 800 feet, but he in fact drilled to the depth of 1428 feet. There was a trace of oil found in a sand ten feet deep at a depth of 292 feet. There were four or five other showings of oil as the drilling progressed. The oil found appears not to have been good, and no oil or gas in commercial quantities was ever found. The land on which the drilling was done does not seem to be in a producing area, and so far as the record shows only one well was drilled. We gather that there is a Spring Valley oil field which is a producing field, and oil from that field

has been shipped from time to time into the State of Utah for refining. The distance of the land in question here from that field and the producing area therein does not appear. There is a topping plant ten to fifteen miles from Section 16, supra, which is in operation. It seems that if oil is to be refined further it would have to be shipped to a refinery in Utah or to Parco in this State, the latter place being considerably farther away than the refinery in Utah. Gaylord stated that if oil in commercial quantities were found he would be glad to ship it to Utah, and plaintiff sought to show that if any oil in commercial quantities were produced it would normally be shipped to Utah for refining.

When Atwater received his first pay check about two weeks after he commenced work, and which was at the rate of $1.50 per hour, he asked Gaylord about overtime. The latter stated that he had been informed that he did not come under the Fair Labor Standards Act. Atwater answered that if that were so it would be all right. Subsequently in 1945, however, he made inquiries in relation thereto and received a letter from the Denver office of the United States Department of Labor, which he interpreted as indicating that he was entitled to wages for overtime. He showed the letter to Gaylord, who, apparently interpreting the letter likewise, stated that he could not afford to pay such wages, and he then ceased drilling entirely and Atwater and Brown were discharged. No wages for overtime, however, were ever paid and the suit herein resulted. In the meantime both Atwater and Brown filed a claim for a lien against the personal property used in the drilling and the interest, if any, which Gaylord had in the land, and foreclosure of the lien was asked in the petition filed in this action.

Section 207 of the Congressional Act above mentioned provides for a work week of 40 hours for employees

who are engaged in commerce or in the production of goods for commerce, and prohibits employment for a longer time unless the employees receive compensation for their employment in excess of these hours at a rate not less than $1\frac{1}{2}$ times the regular rate at which they are employed. Sec. 216 of the Act provides that an employer who violates the foregoing provision shall be liable to the employee affected in the amount of the unpaid overtime and in an additional equal amount as liquidated damages, and that in the action brought for the recovery of such amount, attorney's fees may be allowed to the plaintiff. Section 203 defines commerce as "trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof." It defines goods as meaning "goods * * * wares, products, commodities, merchandise, or articles or subjects of commerce." It is stated that "produced" means "produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this chapter an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any State."

We need not pause to consider the questions raised by counsel relating to the liens which are claimed by the plaintiff herein, nor the questions relating to the intention, expectation or hope of the defendant to ship oil, which might be produced, in interstate commerce. We may at once proceed to consider the more fundamental question arising in this case. No oil or gas in commercial quantities was ever produced, and we must inquire as to what is the situation in this case by reason of such non-production. It was said in Roland Electrical Company vs. Walling, 326 U. S. 657, 66 S. Ct.

413, 418: "The primary purpose of the Act is not so much to regulate interstate commerce as such, as it is, through the exercise of legislative power, to prohibit the shipment of goods in interstate commerce if they are produced under substandard labor conditions." Such being the purpose of the Act, it follows, of course, that it cannot apply in the absence of good which may be shipped in such commerce. If no goods came into existence which may be shipped, the purpose of the Act wholly fails. The situation applicable to oil and gas would be equally applicable to gold, silver, copper, bentonite, and other minerals, and the broad question before us is as to whether or not labor employed in a search or exploration of minerals comes within the Fair Labor Standards Act if the search or exploration is futile and no minerals in commercial quantities are found. In case of such failure no goods come into existence; there is no production to go into commerce; there is nothing to sell; nothing to trade; no goods to handle; nothing to transport. It would seem to be elementary that in such case labor employed in such futile search or exploration cannot come under the Fair Labor Standards Act, for by no possible stretch of imagination is any interrelation between such labor and commerce, let alone interstate commerce, conceivable.

Reliance is placed by counsel for plaintiff on Warren-Bradshaw Drilling Co. vs. Hall, 317 U. S. 88, 63 S. Ct. 125, 87 L. Ed. 83. We are unable to see how that case furnishes any grounds for recovery herein. In that case the employees in question were engaged in drilling oil wells with a rotary drilling rig to a certain depth short of the oil stratum, and then proceeded from there to drill other wells. An expert crew of drillers with different equipment would "bring in the wells", that is to say, made the wells actually producing wells. Thirty-two wells in all were drilled; thirty-one of them pro-

duced oil and one of them gas. The evidence showed that some of the oil produced from the wells ultimately found its way into interstate commerce, and the court held that the employees, drilling with a rotary rig to a certain depth as above mentioned, came under the Fair Labor Standards Act, considering the work done as a whole. The case at bar does not bear the slightest resemblance to that case for there was no production in this case, and no oil or gas came into existence which could possibly enter commerce, let alone interstate commerce. The fact that in that case the drillers with a rotary rig, who themselves did not produce the oil, were held to be within the Fair Labor Standards Act does not make that case and the case at bar similar. Their work was just as instrumental in bringing the oil and gas into existence as any other; it was not futile as was the work in the case at bar.

We have also been cited to Robertson vs. Oil Well Drilling Co. 47 N. Mex. 1, 131 Pac. 2d 978; Mid-Continent Pipe Line Co. vs. Hargrave, 129 Fed. 2d 655; Divine vs. Levy, 39 Fed. Supp. 44; St. John vs. Brown, 38 Fed. Supp. 385. In each of these cases it appears that oil had been produced; none of them present facts showing futile efforts at production as in the case at bar, and none of these cases, therefore, are in point herein.

The case of Culver vs. Bell & Loffland, 9th Circuit, 146 Fed. 29, presents a case in which plaintiff drillers were employed to drill wells in a producing field. Some of the wells drilled were producing, others were not. Part of the oil produced passed into interstate commerce. The trial court held that the work in drilling the producing wells came within the Fair Labor Standards Act, but that the work in drilling the non-producing wells did not. The court of appeals, however, considered the work done as a totality and held that the

work in drilling the non-productive wells also came within the intent of the Congressional Act. The court said in part: "In the course of drilling in oil producing areas, such as we are concerned with here, it is inevitable that some of the holes will turn out to be dry. Nevertheless the entire drilling process is essential to the exploitation and delineation of the field. The object of all drilling operations of this nature is production, for obviously no well would be drilled if it were known in advance that the well would be a dry hole. Waste of energy and the frustration of well-intended effort are not peculiar to the oil business." If the case at bar presented facts like those in that case there would be more merit in the contention of plaintiff herein. But no oil or gas in commercial quantity was produced by the drillers here in question. It was not even shown that the field in which the drilling was done was a producing field, or that further drilling might have produced oil in sufficient quantity to move in commerce. The burden that the work of the employees herein comes within the Fair Labor Standards Act was on the plaintiff. Warren-Bradshaw Drilling Company vs. Hall, supra.

The Congressional Act in question provides that an employee shall be considered as engaged in the production of goods (for interstate commerce) if he is engaged "in any process or occupation necessary for the production thereof." However, as already intimated, the term production for interstate commerce necessarily implies something tangible produced, something that comes into existence which is capable of being made the subject of such commerce. It means more than mere hope of, or attempt at, production. "Production connotes the creation of something." Kiechhefer Container Co. vs. Unemployment Compensation Commission, 125 N. J. L. 52, 13 Atl. 2d 646, 648. "Black's Law Dictionary defines 'production' in political econ-

omy as 'the creation of objects which constitute wealth'." Cole Petroleum Co. vs. U. S. Gas & Oil Co., 121 Tex. 59, 41 S. W. 2d 414, 416. As was said in the case of Baloc vs. Foley Bros., 68 Fed. Supp. 533,—though that case involves facts different from the case at bar—"Manifestly, plaintiffs could not be 'engaged in the production of goods for commerce' before the actual production was commenced." It is true that the production of oil or gas stands on a somewhat different footing from the manufacture of ordinary goods, and if oil or gas in commercial quantity is actually found and production becomes an actuality, such production, under Warren-Bradshaw Drilling Co. vs. Hall, supra, relates back to the drilling, since that is necessary to effectuate such production. But where no actual production ensues there is obviously nothing to which such relation back can apply.

In Gill vs. Electro Manganese Corporation, 177 Tenn. 81, 146 S. W. 2d 352, the corporation desired to engage in the manufacture of manganese of a purity of 99 9/10 percent. To do so it was necessary to do a lot of experimentation, and the corporation was engaged in such experimentation during the months of May to September of 1939. During that time it was not, of course, engaged in any production for commercial use or in the sale thereof in commerce. It perfected its process at the end of September and thereupon engaged in the manufacture of manganese of the purity above mentioned and entered interstate commerce, and from that time on paid its employees in accordance with the provisions of the Fair Labor Standards Act. The question was as to whether or not the employees came under that Act while the experimentation was going on. The court held that they did not and stated in part:

"We think there is a clear distinction between experimenting in an attempt to produce or to discover a desired commodity or remedy and manufacturing that

article or remedy for commercial purposes after it has been perfected. Henry Ford, when experimenting in his workshop in an attempt to produce a machine to be operated by gasoline, could hardly be said to be engaged in commerce; although, after he had completed and perfected his famous engine, he did engage in commerce on a very large scale.

"For many years chemists have been laboring in laboratories in an attempt to find a remedy for the cure of cancer, with an intention of manufacturing and selling it commercially when discovered. But it would be absurd to say that these chemists are engaged in commerce or in the production of goods for commerce."

See annotation 161 A. L. R. 1250. The likeness between that case and the case at bar lies in the fact that in both the labor in question was employed in exploration, in connection with which no commercial production resulted. However, the labor in the case at bar is even further removed from interstate commerce than the labor in the Gill case, for the labor involved in that case was a link in the chain of causation of ultimate production and interstate commerce. Even the early explorations of Henry Ford were links, though perhaps weak links, in that chain of causation. In the case at bar there are no such links. There is no such chain at all. Less reason, accordingly, exists for the application of the Fair Labor Standards Act to the labor in question herein. That Act applies when the labor in question stands in some relation to interstate commerce. When there can be no such commerce under any conceivable facts, as in the case at bar, the Act cannot apply, and it would be beyond the power of Congress to have it apply. We are bound, of course, by the decisions of the Supreme Court of the United States in interpreting the Congressional Act aforesaid. But extensive as the tentacles of interstate commerce have become under its recent decisions, it has not gone as far as counsel for plaintiff seems to think. In McLeod vs. Threlkeld, 319 U. S. 491, 497, 63 S. St. 1248, 1251,

87 L. Ed. 1538, it was said that the test whether activities of employees come within the Fair Labor Standards Act is whether "they are actually in or so closely related to the movement of the commerce as to be a part of it." Obviously, if these activities result in nothing which can become a "part of it", the Act cannot apply. In other words, just as it still remains true that something cannot be created out of nothing, so it still remains true that no relation of labor to interstate commerce can arise if nothing exists that could enter into such commerce.

*The judgment of the trial court is affirmed.*

RINER, C. J., and KIMBALL, J., concur.