J. Robert SEALY, Appellant,

v.

James P. MITCHELL, Secretary of Labor, United States Department of Labor, Appellee

No. 16750.

United States Court of Appeals
Fifth Circuit.

Nov. 18, 1957.

328

J. Willis Conger, Bainbridge, Ga., Conger & Conger, Bainbridge, Ga., of counsel, for appellant.

Harry M. Leet, Atty., Bessie Margolin, Asst. Sol., Stuart Rothman, Sol., U. S. Dept. of Labor, Washington, D. C., Beverley R. Worrell, Regional Atty., Birmingham, Ala., for appellee.

Before RIVES, JONES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

This case, consolidating two actions by the Secretary, one for a record-keeping injunction under Section 17, 29 U.S.C.A. § 217, and the other for unpaid overtime and penalties on behalf of specific employees, 29 U.S.C.A. § 216(c), raises the question whether the drilling of a wild wildcat well in Georgia is itself under the Fair Labor Standards Act as commerce or production of goods for commerce and, if not, whether it is obliquely brought under coverage by the mere act of furnishing of "cuttings" under a dry hole letter or the occasional handling of oil well drilling supplies received on the well site from out of state. The District Court held that the activity was covered. We disagree.

Of course, if Warren-Bradshaw Drilling Co. v. Hall, 317 U.S. 88, 63 S.Ct. 125, 87 L.Ed. 83, affirming our decision 5 Cir., 124 F.2d 42, is the alpha and omega, and as such is to be read as a perpetual memorial that the drilling of *any* oil well at *any* time and at *any* place is production of goods for commerce, we are setting out on a voyage of short duration. But neither what is there held or said, or

elsewhere followed,[1] nor the natural application of the decision in rejecting the contention that coverage depends on a mechanical test of the fortuitous result of a producing, not a dry hole, Culver v. Bell & Loffland, Inc., 9 Cir., 146 F.2d 29, compels any such inflexible result.

The drilling for oil itself is not commerce. The drilling for oil may be production of goods for commerce because oil can only be produced by drilling for it. But drilling becomes production of goods only if there is some reasonable expectancy that "goods," i. e., oil, will be produced either in that well or in those within some reasonable geographical range as a result of scientific and technical knowledge gained from the well, if dry or abandoned, then being drilled.

The Court's reliance on the fact that "The record contains ample indication that there were reasonable grounds for petitioner [the driller] to anticipate, at the time of drilling, that oil produced by the wells drilled, would move into other states," Warren-Bradshaw Drilling Co. v. Hall, supra, 317 U.S. at page 92, 63 S.Ct. at page 127, and like emphasis by the Ninth Circuit that "In the course of drilling in oil producing areas, such as we are concerned with here, it is inevitable that some of the holes will turn out to be dry * * * [and] * * Work done in the drilling of a dry hole in a producing field is at least as necessary and as closely related to the process of production as are the services of a building maintenance employee in a building occupied as a factory * * *," Culver v. Bell & Loffland, supra, 146 F.2d at page 32, reflect quite plainly that there is no magic in a drilling rig, its operation or the act of drilling. It is significant only because it is the means by which "goods"—oil—is to be produced.

Here, while we would agree that the record, skimpy as it is, would yet justify a conclusion that *if* ("and the if is a big one", Mitchell v. Hodges Contracting Co., 5 Cir., 238 F.2d 380, 383) oil were

1. See e. g., Durkin v. Waldron, D.C.La., 130 F.Supp. 501; Straughn v. Schlumberger Well Surveying Corp., D.C.Tex., 72 F.Supp. 511; West v. Texas Co., D.C. La., 65 F.Supp. 97; Atwater v. Gaylord, 63 Wyo. 492, 184 P.2d 437.

discovered in commercial quantities from Sealy's activities, the oil would surely move in interstate commerce, there is no basis for a judicial conclusion either that oil was produced or would likely be produced. Nor is there any evidence whatsoever that in the industry's relentless search for more oil reserves, the drilling of this well, if ultimately dry as it was, would advance or aid or facilitate production in other fields or areas.

That Sealy, with the inveterate optimism of wildcatters who play long odds to contemplate great recoveries, may have thought or hoped that oil would be found is insignificant in the face of this record. The standard, first, is not a subjective one for even the expectancy that goods will move in interstate commerce is an objective one "according to the normal course of his business," United States v. Darby, 312 U.S. 100, 118, 61 S.Ct. 451, 459, 85 L.Ed. 609, 619, since an employer, to the law, sees that which he ought to have seen. Mitchell v. Raines, 5 Cir., 238 F.2d 186, 188.

Sealy, on this record at least, a man with no previous experience whatsoever in any phase of the oil business, without knowledge or experience, technical or practical, in the exploration and search for oil, somehow [2] hoped to find oil on his land in Georgia located in Seminole County within half a mile of some leases held by a major oil company.[3]

Had his hopes come true, he would have made history. For Georgia is without any production of oil or gas in commercial quantities. Indeed, so much sought is the prosperity following in the wake of oil and gas production that the State of Georgia has added to the wildcatter's dreams the hope of an even higher reward. For by constitutional amendment in recent years, the people of Georgia have held out and increased the bounty to a quarter of a million dollars for the first commercially producing well while reducing the standard of commercial productivity from 250 barrels to 100 barrels per day.[4]

Except for Sealy's hope and his willingness to spend his money on a venture which, to this date in this record, no qualified person has yet expressed even a guarded opinion of the remotest prospect of success, there is nothing to afford a basis for a conclusion that they were here producing goods—oil. The concept that coverage must be "determined by practical considerations, not by technical conceptions," Mitchell v. C. W. Vollmer & Company, Inc., 349 U.S. 427, at page 429, 75 S.Ct. 860, 862, 99 L.Ed. 1196, 1200; Archer v. Brown & Root, 5 Cir., 241 F.2d 663, is a standard which

---

2. On the argument his counsel described him as a "doodle-bug" operator who, like many others in the colorful history of the oil business have put great stock in forked twigs and similar devices to locate structures.

3. Humble Oil & Refining Company held leases on 428,000 acres of Georgia land including approximately 35,000 acres in Seminole County.

4. Georgia Const. art. VII, § 1, Par. II, Subpar. 1, ratified 1950, Acts 1950, p. 480:

"Provided, however, that the General Assembly is hereby authorized to provide by law for the payment of one hundred thousand dollars ($100,000.00) to the first person * * * which puts down and brings in the first commercial oil well in the State of Georgia, provided said commercial oil well shall be a well **producing** at least 250 barrels of oil per day as determined by State Geologist."

By Georgia Acts 1955, p. 398, a proposed amendment was submitted which was ratified by the people of Georgia on November 6, 1956:

"The General Assembly is authorized to provide by law for the payment of two hundred fifty thousand dollars ($250,000.00) to the first person * * * which puts down and brings in the first commercial oil well in this State. Such well must produce at least 100 barrels of oil per day * * * Said law shall provide for the distribution of said amount as the General Assembly may by statute provide between the company or individual who drills or causes to be drilled said well, the contractor who furnishes the equipment, among such workmen and employees actually engaged in the job, and to the mineral and/or property owner where the well is drilled. * * *."

cuts both ways. And here, from a practical standpoint, judged in the realities of the oil industry, not a single qualified person expressed even a remote opinion that there were any prospects for oil at this location. And without something more than a hope, the drilling, while closely related and directly essential to demonstrating whether that hope had good or bad foundation, was not then the act of producing oil.[5]

That this exposition does not furnish a ready, mechanical test by which with seismographic accuracy, it can be determined whether a given drilling well in a given area or field is or is not within the coverage of the Act does not militate against our conclusion. For we have long recognized, "That some operations in the oil business as a whole, and some even in preparation for production, are neither operations in the production of oil, nor processes or occupations necessary for the production thereof; and that an extreme construction of the act, bringing all operation in the oil industry under it, would produce a reductio ad absurdum * * *," Warren-Bradshaw Drilling Company v. Hall, supra, 124 F.2d at page 44. Between a wildcat well which turns out to be dry in generally productive area and one which, as here, is dry in an area bereft of any reasonable expectancy of success, there are many variables which, taken together, may finally determine the decisive question of coverage. We need not and do not draw that line now. We simply hold that at the extreme limit of this record, this was not production of oil and without production of oil, there was neither production

of goods for commerce and hence there was no one engaged in "working * * in any closely related process or occupation directly essential to the production * * *," 29 U.S.C.A. § 203(j), of such goods (oil).

■ On the oblique approach little need be said. The effort to make the handling, receipt or unloading of oil well supplies received from out-of-state sources an activity "in commerce" fails for want of a sufficient record. What these items were, how often they were received, what were their sources outside of Georgia, and what any one or more or all of these employees on the drilling rig had to do with them was equivocal and extremely vague. The evidence did not show that as to any one of the drilling crew, such items were received and handled by them with any substantial regularity or continuity of action. Of course, the occasional, irregular, infrequent, sporadic receipt from time to time of some material from beyond the state is not sufficient to make such activity in "commerce" and thus invoke coverage.[6]

■ The effort to make the furnishing of "cuttings" to Humble under the dry hole letter, note 5, supra, fares no better. The cuttings referred to apparently were those found in the drilling fluid. A sample was taken every ten feet, one part of which was furnished to the State Geologist for the State of Georgia, one retained by Sealy, the driller wildcatter, and a third was picked up by Humble's scouts at the well and then presumably taken by Humble's representative to Tallahassee, Florida, to be studied by a paleontologist.[7]

---

5. The deficiency is not aided by the fact, without more at least, that in a "dry hole letter" under which in return for access to the well during drillings and to cores, cuttings, logs and other information, Humble Oil & Refining Co., as is frequently done with wildcatters, agreed to (and did) contribute $12,000 to Sealy if the well, drilled to a depth of 6,000 feet, were completed as a dry and abandoned well.

6. Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460, mod-

ifying sub nom. Fleming v. Jacksonville Paper Co., 5 Cir., 128 F.2d 395; Tilbury v. Rogers, D.C.La., 123 F.Supp. 109, aff'd per curiam, 5 Cir., 220 F.2d 757; Divins v. Hazeltine Electronics Corp., 2 Cir., 163 F.2d 100; Skidmore v. John J. Casale, Inc., 2 Cir., 160 F.2d 527; Parkham v. Austin Co., 5 Cir., 158 F.2d 566.

7. In no event could furnishing of cuttings have any significance after December 12, 1955, at which time the well was certified to Humble's satisfaction as dry and aban-

We do not think that these oil cuttings amount to "goods" as the Act, 29 U.S. C.A. § 203(i), defines [8] them. While the "cuttings" came from the drilling, they were not the product of that drilling, nor as products were they "products * * * of commerce." Nor is there any evidence to show that cuttings were the subject of commercial transactions and, as such, traded in, dealt with, sold or exchanged. While the definition is broad in scope and may thus include more than tangibles, those things which do not meet the traditional conception of wares, products, commodities, merchandise must yet be articles or subjects *of commerce*. These cuttings had no commercial or market utility or value apart from scientific information which professional experts could glean from them. The important factor to Humble in its dry hole letter was to obtain access to information. In this respect the cuttings stand exactly as would the oral report from a toolpusher or a driller to Humble's scout on the well floor, observation by a scout of an electrical logging or survey then in progress, his inspection on the well site of a Schlumberger log picture, or his smelling or tasting of fluids coming from the well during operations. This is technical intelligence, knowledge and information, not goods. As technical professional information conveying only a message of intelligence and not the subject of a commercial activity, these cuttings were not goods.[9]

■ As we hold that there was no substantial evidence to warrant the District Court's conclusion that this well was engaged in the production of oil or that the employees were engaged in commerce, or in the production of goods (cuttings), these conclusions were clearly erroneous and may not stand, F.R. Civ.P. 52(a), 28 U.S.C.A., Galena Oaks Corp. v. Scofield, 5 Cir., 218 F.2d 217.

Reversed and rendered.

RIVES, Circuit Judge (dissenting).

If the employees were engaged in work having any economic significance, it was in the production of goods for commerce. The ascertainment of their wages could not await the ultimate success or failure of the project but depended upon the work in which they were currently engaged. Nor do I think that an employer who undertakes to produce goods for commerce can defeat his employees' claims under the Act by an alleged defense that because, by afterthought, the conduct of the employer himself appears to have been foolish or reckless, it can now be seen that the employees were really engaged in no useful work. If an employer has thus abused the dignity of labor, he cannot visit the consequences upon his employees.

I therefore respectfully dissent.

---

doned and their dry hole letter payment of $12,000 made. Sealy's persistence and hopes continued undiminished and the drilling operations, characterized by one of the plaintiff drillers as woefully inefficient from Sealy's lack of experience, kept on through November of 1956 and may yet be continuing. The result is that a well which would normally take but a month or so has been drilling for over eighteen months from the spring of 1955 at least down through November 1956.

8. § 203(i): " 'Goods' means goods (including ships and marine equipment), wares, products, commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof, but does not include goods after

their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof."

9. See, e. g., McComb v. Turpin, D.C.Md., 81 F.Supp. 86; Collins v. Ford, Bacon & Davis, D.C.Pa., 71 F.Supp. 229; Kelly v. Ford, Bacon & Davis, D.C.Pa., 71 F.Supp. 311, affirmed 3 Cir., 162 F. 2d 555; Scholl v. McWilliams Dredging Co., 2 Cir., 169 F.2d 729; Bozant v. Bank of New York, 2 Cir., 156 F. 2d 787; Mitchell v. Welcome Wagon, Inc., D.C.Tenn., 139 F.Supp. 674; cf. Lofther v. First Nat. Bank of Chicago, D.C.Ill., 48 F.Supp. 692, affirmed 138 F.2d 299.