Justice Scalia,
concurring in the judgment.
I agree with the Court’s holding that the Controlled Substances Act (CSA) may validly be applied to respondents’ cultivation, distribution, and possession of marijuana for personal, medicinal use. I write separately because my understanding of the doctrinal foundation on which that holding rests is, if not inconsistent with that of the Court, at least more nuanced.
Since Perez v. United States, 402 U. S. 146 (1971), our cases have mechanically recited that the Commerce Clause permits congressional regulation of three categories: (1) the *34 channels of interstate commerce; (2) the instrumentalities of interstate commerce, and persons or things in interstate commerce; and (3) activities that “substantially affect” interstate commerce. Id., at 150; see United States v. Morrison, 529 U. S. 598, 608-609 (2000); United States v. Lopez, 514 U. S. 549, 558-559 (1995); Hodel v. Virginia Surface Mining & Reclamation Assn., Inc., 452 U. S. 264, 276-277 (1981). The first two categories are self-evident, since they are the ingredients of interstate commerce itself. See Gibbons v. Ogden, 9 Wheat. 1, 189-190 (1824). The third category, however, is different in kind, and its recitation without explanation is misleading and incomplete.
It is misleading because, unlike the channels, instrumen-talities, and agents of interstate commerce, activities that substantially affect interstate commerce are not themselves part of interstate commerce, and thus the power to regulate them cannot come from the Commerce Clause alone. Rather, as this Court has acknowledged since at least United States v. Coombs, 12 Pet. 72 (1838), Congress’s regulatory authority over intrastate activities that are not themselves part of interstate commerce (including activities that have a substantial effect on interstate commerce) derives from the Necessary and Proper Clause. Id., at 78; Katzenbach v. McClung, 379 U. S. 294, 301-302 (1964); United States v. Wrightwood Dairy Co., 315 U. S. 110, 119 (1942); Shreveport Rate Cases, 234 U. S. 342, 353 (1914); United States v. E. C. Knight Co., 156 U. S. 1, 39-40 (1895) (Harlan, J., dissenting).[1] And the category of “activities that substantially affect interstate commerce,” Lopez, supra, at 559, is incomplete because the authority to enact laws necessary and proper for the regulation of interstate commerce is not limited to laws *35 governing intrastate activities that substantially affect interstate commerce. Where necessary to make a regulation of interstate commerce effective, Congress may regulate even those intrastate activities that do not themselves substantially affect interstate commerce.
I
Our cases show that the regulation of intrastate activities may be necessary to and proper for the regulation of interstate commerce in two general circumstances. Most directly, the commerce power permits Congress not only to devise rules for the governance of commerce between States but also to facilitate interstate commerce by eliminating potential obstructions, and to restrict it by eliminating potential stimulants. See NLRB v. Jones & Laughlin Steel Corp., 301 U. S. 1, 36-37 (1937). That is why the Court has repeatedly sustained congressional legislation on the ground that the regulated activities had a substantial effect on interstate commerce. See, e. g., Hodel, supra, at 281 (surface coal mining); Katzenbach, supra, at 300 (discrimination by restaurants); Heart of Atlanta Motel, Inc. v. United States, 379 U. S. 241, 258 (1964) (discrimination by hotels); Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U. S. 219, 237 (1948) (intrastate price fixing); Board of Trade of Chicago v. Olsen, 262 U. S. 1, 40 (1923) (activities of a local grain exchange); Stafford v. Wallace, 258 U. S. 495, 517, 524-525 (1922) (intrastate transactions at stockyard). Lopez and Morrison recognized the expansive scope of Congress’s authority in this regard: “[T]he pattern is clear. Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained.” Lopez, supra, at 560; Morrison, supra, at 610 (same).
This principle is not without limitation. In Lopez and Morrison, the Court — conscious of the potential of the “substantially affects” test to “ ‘obliterate the distinction between what is national and what is local,’ ” Lopez, supra, at 566-567 *36 (quoting A. L. A. Schechter Poultry Corp. v. United States, 295 U. S. 495, 554 (1935)); see also Morrison, supra, at 615-616 — rejected the argument that Congress may regulate noneconomic activity based solely on the effect that it may have on interstate commerce through a remote chain of inferences. Lopez, supra, at 564-566; Morrison, supra, at 617-618. “[I]f we were to accept [such] arguments,” the Court reasoned in Lopez, “we are hard pressed to posit any activity by an individual that Congress is without power to regulate.” 514 U. S., at 564; see also Morrison, supra, at 615-616. Thus, although Congress’s authority to regulate intrastate activity that substantially affects interstate commerce is broad, it does not permit the Court to “pile inference upon inference,” Lopez, supra, at 567, in order to establish that noneconomic activity has a substantial effect on interstate commerce.
As we implicitly acknowledged in Lopez, however, Congress’s authority to enact laws necessary and proper for the regulation of interstate commerce is not limited to laws directed against economic activities that have a substantial effect on interstate commerce. Though the conduct in Lopez was not economic, the Court nevertheless recognized that it could be regulated as “an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated.” 514 U. S., at 561. This statement referred to those cases permitting the regulation of intrastate activities “which in a substantial way interfere with or obstruct the exercise of the granted power.” Wrightwood Dairy Co., supra, at 119; see also United States v. Darby, 312 U. S. 100, 118-119 (1941); Shreveport Rate Cases, supra, at 353. As the Court put it in Wrightwood Dairy, where Congress has the authority to enact a regulation of interstate commerce, “it possesses every power needed to make that regulation effective.” 315 U. S., at 118-119.
*37 Although this power “to make . . . regulation effective” commonly overlaps with the authority to regulate economic activities that substantially affect interstate commerce,[2] and may in some cases have been confused with that authority, the two are distinct. The regulation of an intrastate activity may be essential to a comprehensive regulation of interstate commerce even though the intrastate activity does not itself “substantially affect” interstate commerce. Moreover, as the passage from Lopez quoted above suggests, Congress may regulate even noneconomic local activity if that regulation is a necessary part of a more general regulation of interstate commerce. See Lopez, supra, at 561. The relevant question is simply whether the means chosen are “reasonably adapted” to the attainment of a legitimate end under the commerce power. See Darby, supra, at 121.
In Darby, for instance, the Court explained that “Congress, having ... adopted the policy of excluding from interstate commerce all goods produced for the commerce which do not conform to the specified labor standards,” 312 U. S., at 121, could not only require employers engaged in the production of goods for interstate commerce to conform to wage and hour standards, id., at 119-121, but could also require those employers to keep employment records in order to demonstrate compliance with the regulatory scheme, id., at 125. While the Court sustained the former regulation on the alternative ground that the activity it regulated could have a “great effect” on interstate commerce, id., at 122-123, it affirmed the latter on the sole ground that “[t]he require *38 ment for records even of the intrastate transaction is an appropriate means to the legitimate end,” id., at 125.
As the Court said in the Shreveport Rate Cases, the Necessary and Proper Clause does not give “Congress ... the authority to regulate the internal commerce of a State, as such,” but it does allow Congress “to take all measures necessary or appropriate to” the effective regulation of the interstate market, “although intrastate transactions ... may thereby be controlled.” 234 U. S., at 353; see also Jones & Laughlin Steel Corp., 301 U. S., at 38 (the logic of the Shreveport Rate Cases is not limited to instrumentalities of commerce).
II
Today’s principal dissent objects that, by permitting Congress to regulate activities necessary to effective interstate regulation, the Court reduces Lopez and Morrison to little “more than a drafting guide.” Post, at 46 (opinion of O’Con-nor, J.). I think that criticism unjustified. Unlike the power to regulate activities that have a substantial effect on interstate commerce, the power to enact laws enabling effective regulation of interstate commerce can only be exercised in conjunction with congressional regulation of an interstate market, and it extends only to those measures necessary to make the interstate regulation effective. As Lopez itself states, and the Court affirms today, Congress may regulate noneconomic intrastate activities only where the failure to do so “could . . . undercut” its regulation of interstate commerce. See Lopez, supra, at 561; ante, at 18, 24-25. This is not a power that threatens to obliterate the line between “what is truly national and what is truly local.” Lopez, supra, at 567-568.
Lopez and Morrison affirm that Congress may not regulate certain “purely local” activity within the States based solely on the attenuated effect that such activity may have in the interstate market. But those decisions do not declare noneconomic intrastate activities to be categorically beyond *39 the reach of the Federal Government. Neither case involved the power of Congress to exert control over intrastate activities in connection with a more comprehensive scheme of regulation; Lopez expressly disclaimed that it was such a case, 514 U. S., at 561, and Morrison did not even discuss the possibility that it was. (The Court of Appeals in Morrison made clear that it was not. See Brzonkala v. Virginia Polytechnic Inst., 169 F. 3d 820, 884-835 (CA4 1999) (en bane).) To dismiss this distinction as “superficial and formalistic,” see post, at 47 (O’Connor, J., dissenting), is to misunderstand the nature of the Necessary and Proper Clause, which empowers Congress to enact laws in effectuation of its enumerated powers that are not within its authority to enact in isolation. See McCulloch v. Maryland, 4 Wheat. 316, 421-422 (1819).
And there are other restraints upon the Necessary and Proper Clause authority. As Chief Justice Marshall wrote in McCulloch v. Maryland, even when the end is constitutional and legitimate, the means must be “appropriate” and “plainly adapted” to that end. Id., at 421. Moreover, they may not be otherwise “prohibited” and must be “consistent with the letter and spirit of the constitution.” Ibid. These phrases are not merely hortatory. For example, cases such as Printz v. United States, 521 U. S. 898 (1997), and New York v. United States, 505 U. S. 144 (1992), affirm that a law is not “ *proper for carrying into Execution the Commerce Clause’” “[w]hen [it] violates [a constitutional] principle of state sovereignty.” Printz, supra, at 923-924; see also New York, supra, at 166.
Ill
The application of these principles to the case before us is straightforward. In the CSA, Congress has undertaken to extinguish the interstate market in Schedule I controlled substances, including marijuana. The Commerce Clause unquestionably permits this. The power to regulate interstate commerce “extends not only to those regulations which aid, *40 foster and protect the commerce, but embraces those which prohibit it.” Darby, 312 U. S., at 113. See also Hipolite Egg Co. v. United States, 220 U. S. 45, 58 (1911); Lottery Case, 188 U. S. 321, 354 (1903). To effectuate its objective, Congress has prohibited almost all intrastate activities related to Schedule I substances — both economic activities (manufacture, distribution, possession with the intent to distribute) and noneconomic activities (simple possession). See 21 U. S. C. §§ 841(a), 844(a). That simple possession is a non-economic activity is immaterial to whether it can be prohibited as a necessary part of a larger regulation. Rather, Congress’s authority to enact all of these prohibitions of intrastate controlled-substance activities depends only upon whether they are appropriate means of achieving the legitimate end of eradicating Schedule I substances from interstate commerce.
By this measure, I think the regulation must be sustained. Not only is it impossible to distinguish “controlled substances manufactured and distributed intrastate” from “controlled substances manufactured and distributed interstate,” but it hardly makes sense to speak in such terms. Drugs like marijuana are fungible commodities. As the Court explains, marijuana that is grown at home and possessed for personal use is never more than an instant from the interstate market — and this is so whether or not the possession is for medicinal use or lawful use under the laws of a particular State.[3] *41 See ante, at 25-33. Congress need not accept on faith that state law will be effective in maintaining a strict division between a lawful market for “medical” marijuana and the more general marijuana market. See ante, at 30, and n. 38. “To impose on [Congress] the necessity of resorting to means which it cannot control, which another government may furnish or withhold, would render its course precarious, the result of its measures uncertain, and create a dependence on other governments, which might disappoint its most important designs, and is incompatible with the language of the constitution.” McCulloch, 4 Wheat., at 424.
Finally, neither respondents nor the dissenters suggest any violation of state sovereignty of the sort that would render this regulation “inappropriate,” id., at 421 — except to argue that the CSA regulates an area typically left to state regulation. See post, at 48, 51 (opinion of O’Connor, J.); post, at 66 (opinion of Thomas, J.); Brief for Respondents 39-42. That is not enough to render federal regulation an inappropriate means. The Court has repeatedly recognized that, if authorized by the commerce power, Congress may regulate private endeavors “even when [that regulation] may pre-empt express state-law determinations contrary to the result which has commended itself to the collective wisdom of Congress.” National League of Cities v. Usery, 426 U. S. 833, 840 (1976); see Cleveland v. United States, 329 U. S. 14, 19 (1946); McCulloch, supra, at 424. At bottom, respond *42 ents’ state-sovereignty argument reduces to the contention that federal regulation of the activities permitted by California’s Compassionate Use Act is not sufficiently necessary to be “necessary and proper” to Congress’s regulation of the interstate market. For the reasons given above and in the Court’s opinion, I cannot agree.
* * *
I thus agree with the Court that, however the class of regulated activities is subdivided, Congress could reasonably conclude that its objective of prohibiting marijuana from the interstate market “could be undercut” if those activities were excepted from its general scheme of regulation. See Lopez, 514 U. S., at 561. That is sufficient to authorize the application of the CSA to respondents.

 See also Garcia v. San Antonio Metropolitan Transit Authority, 469 U. S. 528, 584-585 (1985) (O’Connor, J., dissenting) (explaining that it is through the Necessary and Proper Clause that “an intrastate activity ‘affecting’ interstate commerce can be reached through the commerce power”).

 Wickard v. Filburn, 317 U. S. 111 (1942), presented such a case. Because the unregulated production of wheat for personal consumption diminished demand in the regulated wheat market, the Court said, it carried with it the potential to disrupt Congress’s price regulation by driving down prices in the market. Id., at 127-129. This potential disruption of Congress’s interstate regulation, and not only the effect that personal consumption of wheat had on interstate commerce, justified Congress’s regulation of that conduct. Id., at 128-129.

 The principal dissent claims that, if this is sufficient to sustain the regulation at issue in this case, then it should also have been sufficient to sustain the regulation at issue in United States v. Lopez, 514 U. S. 549 (1995). See post, at 52 (arguing that “we could have surmised in Lopez that guns in school zones are ‘never more than an instant from the interstate market’ in guns already subject to extensive federal regulation, recast Lopez as a Necessary and Proper Clause case, and thereby upheld the Gun-Free School Zones Act” (citation omitted)). This claim founders upon the shoals of Lopez itself, which made clear that the statute there at issue was “not an essential part of a larger regulation of economic activity.” Lopez, supra, at 561 (emphasis added). On the dissent’s view of things, *41 that statement is inexplicable. Of course it is in addition difficult to imagine what intelligible scheme of regulation of the interstate market in guns could have as an appropriate means of effectuation the prohibition of guns within 1,000 feet of schools (and nowhere else). The dissent points to a federal law, 18 U. S. C. § 922(b)(1), barring licensed dealers from selling guns to minors, see post, at 52-53, but the relationship between the regulatory scheme of which § 922(b)(1) is a part (requiring all dealers in firearms that have traveled in interstate commerce to be licensed, see § 922(a)) and the statute at issue in Lopez approaches the nonexistent — which is doubtless why the Government did not attempt to justify the statute on the basis of that relationship.